NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0340n.06

No. 25-6066

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 29, 2026
KELLY L. STEPHENS, Clerk

)
UNITED STATES OF AMERICA, )
)
    Plaintiff-Appellee, )
) ON APPEAL FROM THE UNITED
v. ) STATES DISTRICT COURT FOR THE
) WESTERN DISTRICT OF
) TENNESSEE
JARVIS CLAYBORN )
) OPINION
    Defendant-Appellant. )
)

---

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** After a traffic stop in Memphis, Tennessee, a police officer questioned Jarvis Clayborn in the back of a squad car about a Glock pistol with a "switch" found during the stop. The switch made the pistol a "machinegun" under 18 U.S.C. § 922(o). *See United States v. Bridges*, 150 F.4th 517, 519 (6th Cir. 2025) (explaining a switch is "a device that allows a semi-automatic pistol to fire more than one round of ammunition with a single pull of the trigger"). Despite no warning given under *Miranda v. Arizona*, 384 U.S. 436 (1966), the officer asked Clayborn in the squad car if he owned the Glock, and he admitted that he did. Much later, at the police station, a different officer properly gave Clayborn a *Miranda* warning, then obtained from him another confession of ownership of the firearm.

Clayborn moved to suppress both statements under the Fifth Amendment, as incorporated by the Fourteenth Amendment. The district court denied Clayborn's motion to suppress,

he pleaded guilty, and the district court sentenced him to over two years in prison. Clayborn appeals the denial of his motion. The second statement was admissible, so we **AFFIRM**.

## I.

Memphis Police Department officers stopped a car for having expired registration and an illegal window tint. Clayborn was in the passenger-side backseat, where a window was rolled down. Wafting out was an odor of marijuana, which Officer Malcolm Collins smelled. The officers then removed all four occupants, including Clayborn, from the vehicle. An officer searched Clayborn, handcuffed him, and placed him in the back of a squad car. Another officer searched the stopped vehicle, finding the Glock and another firearm, drugs, and money. The officers then began asking the vehicle occupants which found items belonged to whom. But they did so without administering *Miranda* warnings.

Collins queried Clayborn, "so the Glock with the switch on it, that's yours?" Hr'g Ex. 1, Boyd Bodyworn Camera Footage at 25:56–26:00. Clayborn initially denied it but then admitted that the weapon was his. Collins asked again: "the switch is yours?" *Id.* at 26:07–26:08. Clayborn confirmed that it was. Collins then informed him that the handgun would bring him legal trouble. That revelation led Clayborn to change his story and deny ownership of the Glock. Collins then went to another police car, where the driver of the stopped vehicle was detained. After asking the driver about the guns and the drugs, Collins told him, "next time I talk to you, we'll be Mirandizing you, all right?" *Id.* at 28:32–30:55; *id.* at 30:56–31:00.

That "next time" came about three and a half hours later. By then, Clayborn and the vehicle's other occupants had been transported to the police station. Sergeant John Pellett presented Clayborn with a *Miranda* waiver form. Clayborn read the form out loud, said he understood it, signed it, and agreed to talk to investigators. Over the ensuing fourteen-minute

interview, Clayborn informed Pellett that he had told officers on the scene that the Glock was his, that he had owned the pistol for a week, and that he knew the switch made it fully automatic.

A grand jury charged Clayborn with possession of a machinegun under 18 U.S.C. § 922(o). Clayborn filed a motion to suppress all of the statements he made to law enforcement on the date of his arrest. The Government responded that, while it did not intend to use any of Clayborn's pre-*Miranda*-warning statements, Clayborn's post-*Miranda*-warning statements were untainted and thus admissible. The district court denied the motion, declining to suppress the post-*Miranda*-warning statements. Clayborn entered a guilty plea but preserved his right to appeal the suppression ruling. The district court sentenced him to 27 months' imprisonment and 3 years' supervised release. Clayborn timely appealed the denial of his motion to suppress.

**II.**

When considering a district court's denial of a motion to suppress, we review findings of fact for clear error and conclusions of law de novo. *United States v. May-Shaw*, 955 F.3d 563, 566 (6th Cir. 2020). A finding of fact is clearly erroneous when the record definitely and firmly convinces us that the district court made a mistake. *United States v. Guerrero*, 168 F.4th 454, 460 (6th Cir. 2026). We view the evidence in the light most favorable to the district court's conclusion, which we will affirm if it "can be justified for any reason." *May-Shaw*, 955 F.3d at 566–67 (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)).

The Government concedes that Clayborn was in custody when he was handcuffed in the back of the police cruiser, and that he should have been Mirandized before Collins asked him about the contraband. But it argues that the post-*Miranda*-warning statements made at the station were lawfully obtained. We agree.

Sometimes, when engaging in custodial interrogation, officers withhold *Miranda* warnings until they obtain a confession, and use that confession to obtain another, post-*Miranda*-warning confession. *See Guerrero*, 168 F.4th at 463. These "midstream *Miranda*" warnings were examined in *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, an officer purposefully withheld *Miranda* warnings, questioning an unwarned suspect in custodial interrogation for over half an hour until she made a confession. *Id.* at 604–05 (plurality op.). After the confession, the officer gave the suspect a twenty-minute break, then turned on a tape recorder, gave her a *Miranda* warning, obtained a signed waiver of rights, and confronted her with her pre-warning confession. *Id.* at 605. Faced with her previous statements, the suspect again confessed. *Id.* The Supreme Court held that the post-warning statements were inadmissible. *Id.* at 617; *id.* at 618 (Kennedy, J., concurring in the judgment).

*Seibert*, however, "do[es] not automatically render inadmissible a post-*Miranda* confession." *Guerrero*, 168 F.4th at 463. A so-called "midstream *Miranda* warning" can comply with *Miranda* in certain circumstances. Under our precedents, admissibility in this scenario is primarily subject to five factors:

> "(1) the completeness and detail of the questions and answers in the first round of interrogation; (2) the overlapping content of the two statements; (3) the timing and setting of the first and the second rounds; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first."

*Id.* at 463–64 (cleaned up). Ultimately, though, we ask whether suspects have "a genuine choice" over whether to decline to talk after officers provide a midstream *Miranda* warning. *United States v. Woolridge*, 64 F.4th 757, 761–62 (6th Cir. 2023) (quoting *United States v. Ray*, 803 F.3d 244, 272–73 (6th Cir. 2015)).

Clayborn had such a choice here. To be sure, one might conclude that the first and second factors weigh in Clayborn's favor. The initial round of questioning established that Clayborn knowingly possessed the Glock, and that Clayborn knew the gun had a switch on it. True, the initial round of questioning did not constitute a full admission on all elements of § 922(o) because Clayborn was not asked, and did not indicate, whether he knew that the firearm was a machinegun. *See Staples v. United States*, 511 U.S. 600, 615 (1994). But a switch has no purpose other than to enable automatic fire, so awareness of the switch's singular function likely established knowledge that the Glock was a machinegun. *See Bridges*, 150 F.4th at 519 (explaining that a switch "allows a semi-automatic pistol to fire more than one round of ammunition with a single pull of the trigger"). The questioning was therefore likely complete and, though brief, sufficiently detailed. At the station house, Pellett engaged in similar questioning about ownership. He also asked directly whether Clayborn knew the gun was fully automatic, so there was more direct questioning on this issue than there was during the initial questioning. But the effect was the same: Clayborn was asked whether he knowingly possessed a machinegun, and he admitted that he did.

Yet we need not decide this point because the rest of the factors weigh conclusively in the Government's favor. Timing is key in midstream-*Miranda* cases because a short break, especially one that only lasts long enough to read the *Miranda* warning, frequently leaves the suspect without a meaningful understanding that he is free to stop answering questions. *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008). Here, over three hours elapsed between the two rounds of questioning. That was a lot of time for Clayborn to collect himself before receiving his *Miranda* warning, much more than the twenty minutes given to the suspect in *Seibert*. *Seibert*, 542 U.S. at 605 (plurality op.). Compounding the benefit of that break is the fact that, at the police station, the *Miranda* warning and questioning came from an officer who was not at the scene of the traffic

5

stop—again unlike *Seibert*, where the same officer conducted both rounds of questioning in the same place. *Id.* at 604–05. Further, Pellett did not treat his station-house questioning as continuous with Collins's traffic-stop questioning. And unlike the officer in *Seibert*, who used the unwarned statements to elicit a post-warning confession, Pellett did not refer to Clayborn's previous un-Mirandized statements in any capacity. *Id.* at 605. Although Pellett was aware of the pre-warning confession, he did not intimate that he was familiar with the first round of questioning at all.

Clayborn faults Pellett for failing to address the previous confession and explain that it was inadmissible. But Pellett was not required to mention that prior statement when he interviewed Clayborn, and it was better that he did not. Reference to the prior statement could have made Clayborn feel like refusing to answer Pellet's questions was futile, even if he knew the prior statement was inadmissible. *See Seibert*, 542 U.S. at 616–17. Regardless, an officer in Pellett's situation is required to give a *Miranda* warning and ensure that the suspect has a "genuine choice" over whether to speak. *Woolridge*, 64 F.4th at 761–62 (quoting *Ray*, 803 F.3d at 272–73). This standard does not necessarily mean that the officer must rectify or explain the earlier *Miranda* violation, and it did not require Pellett to do so here.

One last consideration. Clayborn argues that the Memphis Police Department's informal policy of asking preliminary questions about ownership before providing *Miranda* warnings violates the spirit of *Seibert*. At the suppression hearing, Collins testified that officers generally do not Mirandize suspects in the field, even though they ask questions to figure out "what belongs to who." R. 58, Suppression Hr'g Tr., PageID 150. Clayborn argues that, pursuant to this practice, the officers in this case intentionally engaged in the kind of two-step interrogation strategy *Seibert* prohibits, and that we should reverse because the officers deliberately undermined *Miranda*. But Clayborn's argument runs headlong into our precedent. Under our circuit's reading of *Seibert*,

6

whether the two-step technique was intentional does not matter. *See Woolridge*, 64 F.4th at 762. To explain why, we need to go back to *Seibert*.

"[N]o opinion commanded a majority in *Seibert* . . . ." *Id.* The *Seibert* plurality developed a factor test, under which intentional or unintentional two-stage interrogations can result in inadmissibility if the midstream *Miranda* warning is ineffective. 542 U.S. at 615. In other words, the plurality laid out an objective test from the suspect's perspective. Justice Kennedy's concurrence—the crucial fifth vote—suggested a different test. *Id.* at 622 (Kennedy, J., concurring in the judgment). Justice Kennedy would have ditched the factors, and "appl[ied] a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* In other words, Justice Kennedy proposed a subjective test from the officer's perspective. Unlike eight of our sister circuits, we have adopted the plurality's approach. *Woolridge*, 64 F.4th at 762 (collecting cases). That means the intent of the officers in the present case is irrelevant. *See id.* Clayborn's arguments are therefore unavailing.

\* \* \*

We **AFFIRM**.